FILED
05/06/2025
Amy McGhee
CLERK
Missoula County District Court
STATE OF MONTANA
By: Latishia lang
DV-32-2025-0000419-IJ
Vannatta, Shane
1.00

Raph Graybill
**Graybill Law Firm, PC**
300 4th Street North
PO Box 3586
Great Falls, MT 59403
(406) 452-8566
raph@graybilllawfirm.com

Abha Khanna*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177
akhanna@elias.law

Marcos Mocine-McQueen*
Marisa A. O'Gara*
Katie Chamblee-Ryan*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
mmcqueen@elias.law
mogara@elias.law
kchambleeryan@elias.law

*Attorneys for Plaintiff*
*\*Motions for Admission Pro Hac Vice Forthcoming*

## IN THE MONTANA FOURTH JUDICIAL DISTRICT COURT
## MISSOULA COUNTY

---

| | |
|---|---|
| Montana Public Interest Research Group, <br><br> Plaintiff, <br><br> v. <br><br> State of Montana and Christi Jacobsen, in her official capacity as Montana Secretary of State, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     House Bill 413 ("HB 413") is unconstitutional because it prevents certain Montanans from registering to vote in the communities where they live. It imposes a new registration requirement forcing student voters—under the threat of

criminal penalties—to predict where they will live once they complete their education. Unless a student voter swears to make the county where she studies her "permanent home" after graduating, she cannot register to vote there. By contrast, non-student voters face no similar residency requirement to tell the government where they plan to live years down the road.

2.    Under HB 413, for example, a Sidney High School graduate who moves to Missoula as a freshman must predict, under penalty of perjury, where she will live once she has earned her degree. If she cannot commit to living in Missoula County in four years' time, she cannot register to vote there—the community where she lives, works, volunteers, likely pays taxes, and studies. But if the same Sidney High graduate drops out of school to work at Rockin Rudy's, she can register to vote so long as she is a resident of Missoula for at least 30 days before an election, irrespective of her future plans.

3.    By imposing special requirements that bar student voters from registering to vote in their communities, HB 413 violates the rights of suffrage and equal protection guaranteed by the Montana and U.S. Constitutions. HB 413 further contravenes state and federal constitutional protections against voter discrimination on the basis of age. And HB 413 offends federal constitutional protections against laws—especially those with severe criminal penalties—that are vague or overbroad. It should be permanently enjoined.

## PARTIES

4.      Plaintiff Montana Public Interest Research Group ("MontPIRG") is a nonpartisan organization representing approximately 27,900 students across the state. The organization is entirely student-directed, led by a board of 18 students who oversee all of the organization's major strategic decision-making. Dedicated to effecting tangible, positive change by educating and empowering the next generation of civic leaders, MontPIRG has worked to register young voters, helped them develop the skills, knowledge, and awareness to strengthen democracy and create better government, and eliminated barriers between young people and the ballot box for more than four decades. For instance, the organization has worked to ensure access to same-day voter registration, supported the passage of the state's Motor Voter Law, and led robust voter-registration campaigns on Montana campuses. Since 2021, MontPIRG volunteers and interns have registered nearly 6,000 voters across the state, a majority of whom were students at the University of Montana in Missoula and Montana State University in Bozeman.

5.      MontPIRG has long stood up to protect the rights of Montana students to vote and become civically engaged in their communities. In recent years, MontPIRG filed suit and successfully enjoined 2021 House Bill 319, which would have prevented students from conducting voter registration in certain parts of college campuses. MontPIRG also filed suit and successfully enjoined 2023 House Bill 892,

which criminalized certain voter registration activities affecting student voters in Montana.

6.    Many of MontPIRG's constituents are young voters who have recently moved within or to Montana to attend college and desire to register and vote in their new community. MontPIRG's constituents come from across Montana and the United States and choose to make Montana their home. They live there. They work and contribute to the economy there. They pay taxes there. They are civically engaged there—petitioning their local officials, volunteering for candidates for local office, participating in collecting signatures for state and local ballot questions, registering new voters, and attending or hosting community and candidate forums. And they vote.

7.    HB 413 singles out these students and requires them to attest—under penalty of perjury—that they intend to make the county where they are studying their "permanent home at the conclusion of" their "educational program," thus deterring and depriving many students of the ability to exercise their fundamental right to vote.

8.    In addition to harming MontPIRG's constituents by preventing them from accessing the franchise, HB 413 will also frustrate MontPIRG's organizational mission of registering young Montana voters and encouraging them to participate in the political process. Advising its constituents as to whether they can register to vote

will be an especially daunting task, as many students will be hesitant to commit or attest to their future residency plans out of fear of criminal prosecution for "falsely represent[ing]" any "information required upon [a] person's voter registration form," § 13-35-207(1), MCA. Additionally, the act of causing a person to be registered "knowing that the person is not entitled" to do so is also a crime in Montana—which will chill MontPIRG's own registration efforts and political speech. Section 13-35-209, MCA.

9.    Defendant Christi Jacobsen is the Montana Secretary of State and is sued in her official capacity. She serves as the state's chief elections officer and is responsible for maintaining uniformity in the application, operation, and interpretation of election laws, including HB 413. Section 13-1-201, MCA. In carrying out these responsibilities, the Secretary has the duty of maintaining the statewide voter registration database, creating the state's voter registration form, and preparing and delivering to election administrators written directives and instructions relating to election law. Sections 13-1-210(1); 13-2-107(1); 13-1-202(1), MCA.

10.    Defendant State of Montana is a governmental entity subject to suit. Mont. Const. art. II, § 18.

## JURISDICTION AND VENUE

11.     Plaintiff brings this action under the Constitutions of the United States and the State of Montana. As a court of general jurisdiction, this Court has authority to hear these claims. Mont. Const. art. VII, § 4; § 3-5-302, MCA; Mont. R. Civ. P. 4; *Claflin v. Houseman,* 93 U.S. 130, 136–37 (1876) ("Rights . . . under the laws of the United States . . . may be prosecuted in the United States courts, or in the State courts.").

12.     This Court has jurisdiction to grant declaratory and injunctive relief under the Montana Uniform Declaratory Judgment Act. Section 27-8-101 *et seq.*, MCA.

13.     Venue is proper in this Court under § 25-2-126(1), MCA as Plaintiff MontPIRG resides in Missoula, Montana, and under §§ 25-2-126(1) and 25-2-125, MCA, because the claim arises in Missoula County. HB 413 prevents MontPIRG from registering its constituents to vote in Missoula County, and there is direct injury to MontPIRG and its constituents in Missoula County.

## FACTUAL ALLEGATIONS

### I.     Registering to vote in Montana

14.     In order to be eligible to register to vote in Montana, a person must: (1) be 18 years of age, (2) be a citizen of the United States, and (3) reside in Montana for 30 days before casting their first vote. Mont. Const. art. IV, § 2; § 13-1-111(1), MCA.

15.    Prospective Montana voters must complete and submit to their county election administrator a voter registration application prescribed by the Secretary of State. Sections 13-2-110, 13-1-210(1), MCA. This form requires each individual to provide their name and other identifying information as well as an acceptable form of identification. Section 13-2-110, MCA. The registrant must also affirm "under penalty of perjury" that all of the information on the voter registration form is correct and that they satisfy the state's requirements for residence.[1]

16.    A person who falsely affirms their eligibility can face criminal prosecution. The election code makes it a criminal offense for anyone to "falsely represent[] the person's name or other information required upon the person's voter registration form." Section 13-35-207(1), MCA. This offense carries a penalty of up to ten years imprisonment. Section 45-7-208, MCA. A separate statute criminalizes causing a person to be registered "knowing that the person is not entitled" to do so. Section 13-35-209, MCA.

## II.    Effect of HB 413 on determining residency for voter registration

17.    Prior to HB 413, a person's "residence" for purposes of registering to vote was "where the individual's habitation [was] fixed and to which, whenever the

---

[1] Office of the Montana Secretary of State, *Montana Voter Registration Application,* https://archive.legmt.gov/content/Committees/Interim/2017-2018/State-Administration-and-Veterans-Affairs/Meetings/Sept-2018/Exhibits/SAVA-Sept6-2018-Ex10.pdf (last visited April 15, 2025).

individual was absent, the individual [had] the intention of returning." Section 13-1-112(1), MCA.

18.    A person who had moved to a Montana county for "temporary purposes" was eligible to register there so long as they had "the intention of making that county [their] home," at the time of registration; they faced no other requirements beyond those placed on every registrant, let alone any requirement to speculate about their future home. Section 13-1-112(5), MCA.

19.    HB 413 creates a new requirement for certain residents wishing to register. Under HB 413, anyone who has moved within or to Montana for a "temporary purpose[], such as temporary work, training, or an educational program," must now also declare, under oath, that they intend to remain in the state or in their county of residence "permanent[ly]" at the conclusion of the program (the "Student Residency Requirement"). The bill amends § 13-1-112(5), MCA, which now reads:

> An individual may not gain **residency** in a county **or the state of Montana** if the individual **relocates** for temporary purposes**, such as temporary work, training, or an educational program,** without the intention of making that county **or the state** the individual's **permanent** home **at the conclusion of the temporary work, training, or educational program**.

20.    Under this law, a person who has moved to or within the state to attend a four-, six-, or even an eight-year course of study at a Montana college or university may not register to vote in the community where they live and study if they cannot

attest under penalty of perjury that they intend to make Montana or the county in which they are studying their permanent home after graduation. The restriction affects any student who—quite reasonably—is not totally certain about their future plans. In other words, any student who is open to the possibility that their first job after graduation may require them to move to another county in Montana or another state may not register or vote where they live.

21.    A large number of Montana students intend to take—or are at least open to taking—employment in another county or another state after graduation. HB 413 would prevent those students from registering to vote in their place of residence during the entirety of their educational program.

22.    Other Montana residents who are not enrolled in or employed by a "temporary" program may register to vote in Montana irrespective of their future plans. Even a person who moves to Montana with no job or educational plans may register regardless of whether they intend to remain in the state or county permanently, so long as they have resided in the state for 30 days and have "the intention of returning" to their Montana home when absent. Similarly, other Montana residents who may have firm plans to eventually move to another state or county may register to vote notwithstanding their intention to move at some future time.

23.     HB 413's effects on determining residency for voter registration are both vague and overbroad. For example, the bill's amendments to previously-existing law insert multiple references to the state, while the prior text only referred to counties. As a result, it is unclear whether, for example, a University of Montana student who moved from Idaho must attest that she will remain in Missoula County or simply the State of Montana to register to vote in Missoula County.

24.     On one reading of the new law, if the student plans to take a job in Bozeman upon graduating, she can register in Missoula County in the intervening years. On another reading, she can only register in Missoula County by swearing she intends to remain in Missoula County after graduation. The text of the statute furnishes no answer. But the stakes for the student could not be higher. One reading allows her to exercise the most basic of fundamental rights—the right to vote. The other does not. And she faces criminal liability if she gets it wrong, or if the county attorney or Montana Attorney General disagree with her.

25.     The statute also does not define "permanent home." It is thus unclear how long a student must remain in a location after graduation to avoid criminal penalties for a voter registration the student completed years earlier. Black's Law Dictionary defines "permanent" as "[e]nduring indefinitely; not subject to change, replacement, fluctuation, or transience." PERMANENT, Black's Law Dictionary (12th ed. 2024). Must a student remain "indefinitely" in Missoula County if she

wants register to vote there as a college freshman? Could the State of Montana really condition access to the franchise on such a draconian restriction on the rights to travel and obtain employment? The statute furnishes no moderating definition or guidance, leaving Montana residents and prospective voters to guess whether the statute really means what it says—and whether an election official or prosecutor will agree.

26.    Nor does the statute define the term "relocate." A student who grows up in Missoula, registers to vote at 18 while in high school, then graduates and attends the University of Montana may "relocate" across town—from his parents' home to Aber Hall. The statute is unclear on whether it would apply when the freshman updates his voter registration to reflect his new address in town. Has the student "relocated," such that he must predict his future residency plans in order to vote? Or does his cross-town move shield him from the new law, and make him able to register like any other Montana resident? Again, the statute furnishes no answer, even as the student faces the specter of criminal liability if he reads it differently than the Montana Attorney General or the county attorney.

27.    Moreover, any reading of the statute requires a Montana student to look years in advance and commit to where she will live—essentially locking student voters into a future residency choice in order to vote, and fencing out those who intend to relocate after graduation from registering altogether, in order to avoid

criminal liability. The statute presents student voters with an impossible choice: choose to remain in the location of your educational program years from now to avoid the criminal penalties, or do not register to vote where you live.

28.     This impossible choice will almost certainly chill the constitutionally-protected acts of voter registration and voting by Montana students.

29.     The severe penalties associated with the statute's vague, undefined terms and unclear implications will also chill MontPIRG's voter registration activities because, like voters themselves, MontPIRG can face criminal liability for aiding voter registration activities on readings of the statute with which a Montana county attorney or other official disagrees.

30.     To be sure, Montana has the right to "require that voters be bona fide residents," *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972), and Montana's universal requirement that a person have a "habitation [that] is fixed and to which, whenever the individual is absent, the individual has the intention of returning" is not at issue in this case. Section 13-1-112(1), MCA. But any residency requirements must be "appropriately defined and uniformly applied." *Dunn*, 405 U.S. at 343. HB 413 fails on both counts.

## III.    Legislative History

31.     HB 413 was initially introduced by Representative Jane Gillette in the Montana House of Representatives on February 6, 2025. It was referred to the House

Committee on State Administration and passed out of Committee on February 24, 2025. From there, it advanced to the House floor, where it narrowly passed along party lines on February 27, 2025. It subsequently passed out of the Senate Committee on State Administration by a 5 to 4 vote, on March 19, 2025, and received final passage by the Senate on April 11. The bill was signed by the Governor on May 1, 2025, and took immediate effect.

32.     While Representative Gillette stated that the purpose of the bill was to "clarif[y] the definition of temporary residency" in the pre-existing version of § 13-1-112(5), Feb. 20, 2025, House State Admin. H'rg at 10:02:53-10:03-06, the bill does no such thing. The phrase "temporary purposes" is given no definition beyond the statute's broad references to "educational program," "training," and "temporary work." Nor is the term "permanent" defined by the statute. In fact, the law provides no temporal limitation or guidance whatsoever that would provide a person of ordinary intelligence the ability to determine whether their program fits into the former or the latter category.

33.     Although the terms "educational program" and "training program" are not defined, Representative Gillette opined that the Student Residency Requirement *would* bar registration by a "student that comes from Helena" and "live[s] in Bozeman . . . to go to MSU" and is "liv[ing] in the dorms" if they return to Helena to "visit their parents, they have Sunday dinner, they do their laundry," Mar. 17,

2025, Senate State Admin. H'rg at 15:06:22–15:06:34, but would somehow *not* bar registration by "a grad student that comes to MSU to study . . . cell biology . . . for three years" whose "girlfriend comes and lives with him" because "we can acknowledge that people move to different places, maybe not being their forever home, but that they live there for extended periods of time," *id*. at 15:06:58–15:07:34. These distinctions, however, are both nonsensical and untethered to the language of the statute. Both graduate and undergraduate programs are "educational programs" that conclude at some pre-defined point; therefore, by the plain language of the statute, students enrolled in both of those programs would all fall under HB 413's amorphous ambit.

34.    In each of the bill's hearings, lawmakers and constituents alike highlighted the bill's many defects. Vice Chair Wendy McKamey pointed out the "inconsistency" between the purported distinctions between graduate and undergraduate students, Mar. 19, 2025, Senate State Admin. H'rg at 18:02:09–18:02:56, recognizing that the strength of a student's ties to their community is not contingent on whether they might do laundry at their parents' house elsewhere as a matter of convenience or financial considerations, so long as they intend to return to school and make their school location their home. Senator Jacinda Morigeau likewise pointed out that the bill is "not clear" about what constitutes a temporary

versus a non-temporary student. Mar. 19, 2025, Senate State Admin. H'rg at 17:59:27–18:00:00 ("It just says educational program.").

35.    To attempt to address these concerns and provide clarity as to the types of programs that would trigger the restriction, Representative Peter Strand tried to amend the bill to define the word "temporary" as a two-week timeframe. Feb. 26, 2025, House Floor Hr'g at 14:48:35-14:48:50 ("Two weeks is temporary but . . . if you're in a community for two years . . . you're contributing to that community economically, socially, and in every other way . . . that should be your residence . . . and you should be able to vote there."). But Representative Gillette objected that "this is not a friendly amendment," *id*. at 14:49:03-14:49:04, and the proposed amendment failed.

36.    Students from across the state also testified against HB 413, emphasizing the harms it would impose on them if enacted. For example, Owen McDaniel, an undergraduate student at MSU and currently a Legislative Fellow of MontPIRG, emphasized that the bill would result in students having "no say in how their communities are run, even if [they] comprise a majority of the population of the towns they reside in." Mar. 17, 2025, Senate State Admin. H'rg at 15:43:08-15:43:15. Another MSU student noted that "a student from Wyoming who pays Montana taxes, works here year-round, and volunteers at the Gallatin Valley Food Bank is no less a resident simply because they haven't decided where to live after

graduation." Feb. 20, 2025, House State Admin. H'rg at 10:07:32-10:08:00. She emphasized that "thousands of out-of-state students at MSU could lose their right to vote in local elections that shape housing policies, transit systems and minimum wage laws, all of which are decisions directly impacting their daily lives. These students aren't just tourists." *Id.* One University of Montana student highlighted the harms HB 413 would inflict on in-state students as well, explaining that it "discourages participation, especially among first-time voters who may already be unfamiliar with the voting process." Mar. 17, 2025, Senate State Admin. H'rg at 15:38:52-15:39:15. She offered the example of a student who lives at University of Montana but is from Sidney, Montana: That student would "have to travel nearly 18 hours roundtrip just to vote in person or they'd have to call their election office to have their ballot mailed out to them in time. These extra hurdles are unnecessary and effectively disenfranchise students." *Id.* "This bill clearly targets students," she said. *Id.* at 15:40:19-15:40:21.

37.    Very few people testified in favor of HB 413 during legislative hearings, and those who did made clear their goal was to suppress student voting in their communities. One proponent who identified himself as someone who "brought this to [Representative Gillette's] attention" explained that he "first got interested in this issue" when he was a "poll watcher" and observed that "there must have been 1,500 students out there." Mar. 17, 2025, Senate State Admin. H'rg at 15:09:02-

15:09:13. He complained that "this is affecting elections," offering the example of his son's "friend who is a legislator" who "lost by twenty votes" because his district included a college campus. *Id*. at 15:17:27-15:17:51. In concluding his remarks, he said: "These kids that show up last minute at the courthouse . . . they've been in the State for six weeks. They're not part of the community." *Id*. at 15:23:35-15:23:41. Senator Tezak, another proponent of the bill, stated that he doesn't "have a lot of sympathy for the students" because his five sons voted by absentee ballot in their hometown while attending college in Montana. Mar. 19, 2025, Senate State Admin. Vote at 18:07:10-18:07:36.

## CLAIMS FOR RELIEF

### <u>FIRST CLAIM</u>
### Montana Constitution, Article II, § 13
### *The Student Residency Requirement violates the Right to Suffrage*

38.    Plaintiff hereby realleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

39.    The Montana Constitution guarantees that "[a]ll elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Mont. Const. art II, § 13.

40.    The Montana Supreme Court has repeatedly affirmed that this provision affords greater protection of the right to vote than the U.S. Constitution. *See, e.g.*, *Montana Democratic Party v. Jacobsen* ("*MDP II*"), 2024 MT 66, ¶ 17,

416 Mont. 44, ¶ 17, 545 P.3d 1074, ¶ 17, *cert. denied sub nom. Christi Jacobsen,*

*Montana Sec'y of State v. Montana Democratic Party*, No. 24-220, 2025 WL 247449

(U.S. Jan. 21, 2025) ("We must first decide whether the Montana Constitution

affords greater protection of the right to vote than the United States Constitution. We

hold that it does.").

41.    The court must first determine whether a law "impermissibly

interfere[s]" with the right to vote or "minimally burdens" that right. *Id.*, ¶ 38. When

a law impermissibly interferes with the right to vote, the court must apply strict

scrutiny; if it minimally burdens the right, a "middle-tier analysis" is applied. *Id.*

42.    A law minimally burdens the right to vote when "[n]o person is

prevented from voting" by the challenged law. *Id.*, ¶ 51. A law impermissibly

interferes with the right to vote when it "grants the right to vote to some citizens and

denies the franchise to others." *Id.*,¶ 34 (citing *Finke v. State ex rel. McGrath*, 2003

MT 48, ¶¶ 17–19, 314 Mont. 314, ¶¶ 17–19, 65 P.3d 576, ¶¶ 17–19) (cleaned up).

43.    Because the Student Residency Requirement denies the vote to citizens

who are engaged in a "temporary" educational or work program and who either do

not intend to reside in that location after completion of the program or are uncertain

about their future plans, it impermissibly burdens the right to vote and must pass

strict scrutiny. Strict scrutiny requires that "the State must show that a law is the

least onerous path to a compelling state interest." *Id.* (citing *Wadsworth v. State*, 275 Mont. 287, 302, 911 P.2d 1165 (1996)).

44.     Under any standard, however, the Student Residency Requirement violates the right to suffrage under the Montana Constitution because it fails to advance any legitimate—let alone compelling—state interest. Although proponents have suggested that HB 413 is necessary to ensure that voters are "familiar[] with the candidates [and] the issues" before voting, Mar. 17, 2025, Senate State Admin. H'rg at 15:09:28-15:09:33, there is simply no reason to believe that residents who have moved for an educational or training purposes are any less-informed than those who have moved for other any other purpose. And while HB 413's supporters may fear that students do not share the values of other residents, the state has no constitutionally permissible interest in policing viewpoints and "'[f]encing out' from the franchise a sector of the population because of the way they may vote." *Dunn,* 405 U.S. at 355; *see also Montana Democratic Party v. Jacobsen* ("*MDP I*"), 2022 MT 184, ¶ 31, 410 Mont. 114 , ¶ 31, 518 P.3d 58, ¶ 31, *abrogated by MDP II*, 2024 MT 66, 416 Mont. 44, 545 P.3d 1074 (noting that there was no valid interest supporting a law that targeted "students from out-of-state").

## SECOND CLAIM
### United States Constitution, Fourteenth Amendment
*The Student Residency Requirement violates the Equal Protection Clause of the 14th Amendment*

45.    Plaintiff realleges and incorporates by reference all prior paragraphs and the paragraphs in the counts below as though fully set forth herein.

46.    The Fourteenth Amendment to the U.S. Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "[T]he States have no power to grant or withhold the franchise on conditions that are forbidden by the Fourteenth Amendment." *Katzenbach v. Morgan*, 384 U.S. 641, 647 (1966).

47.    "[A]n election regulation that imposes a severe burden is subject to strict scrutiny and will be upheld only if it is narrowly tailored to serve a compelling state interest." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

48.    HB 413 is facially discriminatory, arbitrarily imposing its Student Residency Requirement only on those who relocate to or within Montana "for temporary purposes, such as temporary work, training, or an educational program." HB 413, 2025 Leg., 69th Sess. (Mt. 2025). These individuals—even those who have gone to lengths to establish themselves in the state—must further be able to declare their intention to remain in the state or county permanently in order to register to

vote. Other Montana residents will not be subjected to this requirement, regardless of their intent to move at some point in the future.

49.    The statute expressly targets students enrolled in an "educational program" or training program, but "[t]he equal protection clause of the fourteenth amendment does not, of course, permit a state to discriminate against students by denying them the right to vote or by subjecting them to more vigorous registration requirements than are generally applied." *Williams v. Salerno*, 792 F.2d 323, 327–28 (2d Cir. 1986).

50.    Many, if not most, students will be unsure of their post-graduation plans and be unable to take an oath about their future residence. Those students will be entirely denied the franchise and so the burden on the right to vote is severe.

51.    The statute also expressly targets Montana residents engaged in "temporary work," even though "there is no indication in the Constitution that homesite *or occupation* affords a permissible basis for distinguishing between qualified voters within the state." *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (emphasis added). The fact that a person who otherwise satisfies Montana's residency requirement is employed in a temporary job is simply not a constitutionally permissible basis to subject them to a higher standard than others.

52.     There is no legitimate—let alone compelling—state interest in requiring students and others with a "temporary purpose" to declare their intention to make Montana their "permanent" home.

53.     Furthermore, any goal of "fencing out" students from the franchise because of suspicions that they may hold viewpoints different from other residents is unconstitutional on its face. *Dunn*, 405 U.S. at 355.

54.     Since Montana has no valid interest in creating an additional requirement for students who are otherwise eligible to register to vote, no amount of tailoring can bring it in line with the Fourteenth Amendment.

## THIRD CLAIM
### The Constitution of the State of Montana, Art. II, § 4
### *The Student Residency Requirement violates the Montana Constitution's guarantee of equal protection*

55.     Plaintiff realleges and incorporates by reference all prior paragraphs and the paragraphs in the counts below as though fully set forth herein.

56.     The Montana Constitution guarantees that "[n]o person shall be denied the equal protection of the laws." Mont. Const. art. II, § 4. "[T]he Montana Constitution provides even more individual protection than does the Fourteenth Amendment to the U.S. Constitution." *A.J.B. v. Montana Eighteenth Jud. Dist. Ct., Gallatin Cnty.*, 2023 MT 7, ¶ 24, 411 Mont. 201, ¶ 24, 523 P.3d 519, ¶ 24.

57.     Courts must evaluate "potential equal protection violations under a three-step process: (1) we identify the classes involved and determine if they are

similarly situated; (2) we determine the appropriate level of scrutiny to apply to the challenged statute; and (3) we apply the appropriate level of scrutiny to the statute." *Id.*, ¶ 25.

58.    "To identify the classes, [the court must] isolate the factor allegedly subject to impermissible discrimination. If the two classes are equivalent in all other respects, they are similarly situated." *Id.*, ¶ 26.

59.    Students and other residents who have moved to or within the state for a "temporary purpose" are similarly situated to all other Montana residents, including but not limited to those who move to or within Montana with no job or education prospects, those who move for a non-temporary job, and those who have always resided in Montana but firmly intend to move elsewhere in the future.

60.    "The right to vote is a clear and unequivocal fundamental right under the Montana Constitution." *MDP II*, ¶ 13. Courts must "apply strict scrutiny if a fundamental right is affected." *A.J.B.*, ¶ 28.

61.    For the reasons set forth *supra* ¶¶ 47-54, the Student Residency Requirement cannot satisfy strict scrutiny—or any level of judicial scrutiny—and therefore violates the Montana Constitution's guarantee of equal protection.

## FOURTH CLAIM
### United States Constitution Fourteenth Amendment
### *HB 413 is vague in violation of the Fourteenth Amendment*

62.    Plaintiff hereby realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

63.    A law is unconstitutionally vague if "it fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *MontPIRG v. Jacobsen*, 731 F. Supp. 3d 1175, 1186 (D. Mont. 2024) (Morris, J.), *aff'd*, No. 24-2811, 2024 WL 4023781 (9th Cir. Sept. 3, 2024) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)); *see also Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022) (quoting *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012)); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.").

64.    Vague statutes are especially objectionable when they "abut upon sensitive areas of basic First Amendment freedoms," *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964), including the right to vote, *see Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1186–87 (9th Cir. 2021) (First Amendment protects against unjustified burdens on right to vote). *See also MontPIRG*, 731 F. Supp. 3d. at 1186 (same).

65. Moreover, a vague statute can "inhibit the exercise of [First Amendment] freedoms," leading citizens to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas for clearly marked." *Grayned*, 408 U.S. at 109. In this situation, vagueness and overbreadth are present together, reinforcing each other in what some courts have dubbed "[o]verbreadth from indeterminacy." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1505 (11th Cir. 1990).

66. Vague election statutes are even more problematic and harmful where violation runs the risk of criminal penalties. *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554 (9th Cir. 2004) ("If a statute subjects transgressors to criminal penalties . . . vagueness review is even more exacting.").

67. Under § 13-35-207(1), MCA, it is a crime to "falsely represent" any "information required upon [a] person's voter registration form." This offense carries a penalty of up to ten years imprisonment and up to a $50,000 fine. Section 45-7-208, MCA. A separate statute criminalizes causing a person to be registered "knowing that the person is not entitled" to do so. Section 13-35-209, MCA.

68. HB 413 leaves a subset of Montana residents guessing as to how to avoid serious criminal penalties in the course of registering to vote. As a result, prospective voters will be prevented from registering altogether or otherwise chilled from attempting to exercise their fundamental right to vote.

## FIFTH CLAIM
### United States Constitution, First Amendment
### *HB 413 is overbroad in violation of the First Amendment*

69.    Plaintiff hereby realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

70.    "The overbreadth doctrine exists 'out of concern that the threat of enforcement of an overbroad law may deter or "chill" constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions.'" *MontPIRG*, 731 F. Supp. 3d at 1187 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

71.    A law is unconstitutionally overbroad when it exceeds its legitimate objectives and punishes conduct that is otherwise constitutionally protected. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (plurality opinion) ("[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973))).

72.    "In addressing . . . a facial overbreadth challenge, a court's first task is to ascertain whether the enactment reaches a substantial amount of constitutionally

protected conduct." *PEST Comm. v. Miller*, 626 F.3d 1097, 1112 (9th Cir. 2010) (alteration in original) (quoting *Boos v. Barry*, 485 U.S. 312, 329 (1988)).

73.    HB 413 not only fails to accomplish its stated purpose of "clarif[ying]" what the word "temporary" means in the election code, it also reaches far beyond that purported purpose to deter and disenfranchise a large swath of Montana citizens who would otherwise be eligible to vote. In failing to define the terms "temporary purposes" and "permanent" in the statute, HB 413 will inevitably cause large numbers of eligible voters who meet Montana's residency requirement—even under the amended law—to opt out of the political process for fear of registering to vote with anything less than full certainty about their future plans.

74.    As a result, HB 413 will chill students in Montana from exercising their constitutionally-protected rights to register to vote and vote.

75.    Likewise, HB 413 will chill MontPIRG's voter registration activities.

### SIXTH CLAIM
**United States Constitution, Twenty-Sixth Amendment**
***The Student Residency Requirement violates the Twenty-Sixth Amendment***

76.    Plaintiff hereby realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

77.    The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "The right of citizens of the United States, who are eighteen years of

age or older, to vote shall not be denied or abridged by . . . any State on account of age." U.S. Const., amend. XXVI.

78.     "Abridge" means to "curtail, lessen, or diminish; to reduce the extent or scope of." Oxford English Dictionary (3d ed. 2009).

79.     The Twenty-Sixth Amendment's prohibition on age discrimination in voting mirrors the Fifteenth Amendment's prohibition on race discrimination in voting, which provides that voting rights "shall not be denied or abridged . . . on account of race, color, or previous condition of servitude." U.S. Const., amend. XV, § 1. When the Twenty-Sixth Amendment was ratified in 1971, that language in the Fifteenth Amendment had been understood for decades to prohibit not only facially race-based restrictions but also facially race-neutral restrictions that were "motivated by a discriminatory purpose." *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (citing *Guinn v. United States*, 238 U.S. 347 (1915)), *superseded by statute on other grounds*, 96 Stat. 134.

80.     The Twenty-Sixth Amendment was ratified in 1971, as people younger than 21 were being sent overseas to fight in the Vietnam war while being denied the right vote at home. *Texas Democratic Party v. Abbott*, 978 F.3d 168, 185–86 (5th Cir. 2020). The amendment was ratified at least in part in response the alienation felt by students who had "interest and concern" about political issues but were prevented from voicing those concerns at the ballot box by "the anachronistic voting age

limitation" setting the voting age at 21. *Jolicoeur v. Mihaly*, 5 Cal. 3d 565, 573–74, 488 P.2d 1, 6 (1971).

81.     The Congress that proposed the Twenty-Sixth Amendment "uniformly expressed distress at the alienation felt by some youths, and expressed hope that youth's idealism could be channeled within the political system." *Jolicoeur*, 5 Cal. 3d at 572. Congress believed that "some of the student unrest of recent years has led to deplorable violence and intolerance," but also that "much of this unrest reflects the interest and concern of today's youth over the important issues of our day." *Id*. at 573 (quoting S. Rep. No. 92-26, at 365–67 (1971)). And Congress concluded that "we must channel these energies into our political system and give young people the real opportunity to influence our society in a peaceful and constructive manner," lest they be driven "into a search for an alternative, sometimes violent, means to express their frustrations over the gap between the nation's ideals and actions." *Id*. at 573–74 (quoting S. Rep. No. 92-26, at 365–67).

82.     In debating a statutory provision similar to the Twenty-Sixth Amendment a few years before the Amendment was adopted, Congress recognized that youth political energy "is going to continue to build and grow. The only question is whether we should ignore it, perhaps leaving this energy to dam up and burst and follow less-than-wholesome channels, or whether we should let this force be utilized by society through the pressure valve of the franchise." Lowering the Voting Age to

18: Hearing on S.J. Res. 8, S.J. Res. 14, and S.J. Res. 78 Before the Subcomm. on Const. Amends. of the S. Comm. on the Judiciary, 90th Cong. 3, 74 (1968) (statement of Sen. Birch Bayh). With the adoption of the Twenty-Sixth Amendment, Congress elected to channel youth political energy through the vote.

83.    As a result, the Twenty-Sixth Amendment sought "not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden v. Mercer Cnty. Bd. of Elections*, 61 N.J. 325, 345, 294 A.2d 233, 243 (1972). Congress believed that "forcing young voters to undertake special burdens . . . in order to exercise their right to vote might well serve to dissuade them from participating in the election," and thus undermine the Amendment's purpose. S. Rep. No. 92-26, at 14 (1971).

84.    Congress and the courts have recognized that the Amendment has "particular relevance for the college youth who comprise approximately 50 percent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825 (1971) (statements of Sens. Charles Percy and Edward Brooke)).

85.    The Twenty-Sixth Amendment therefore not only lowers the voting age to eighteen, but also prohibits age discrimination in voting, including facially age-

neutral restrictions that are motivated by an age-discriminatory purpose. *See, e.g.*, *League of Women Voters v. Detzner*, 314 F. Supp. 3d 1205, 1222–23 (N.D. Fla. 2018) (holding plaintiffs were substantially likely to succeed on merits of Twenty-Sixth Amendment claim in challenge to restrictive state guidance that prohibited early voting sites on college campuses, finding the prohibition "unexplainable on grounds other than age because it bears so heavily on younger voters"); *Colo. Project-Common Cause v. Anderson*, 178 Colo. 1, 8, 495 P.2d 220, 223 (Colo. 1972) (holding based on "[h]istory and reason" that the Twenty-Sixth Amendment's "prohibition against denying the right to vote to anyone eighteen years or older by reason of age applies to the entire process involving the exercise of the ballot and its concomitants").

86.    This is not the first time in recent years the Montana Legislature has sought to suppress the vote of young voters. After the 2020 election, when turnout among voters between the ages of 18 and 29 increased by nearly 40 percent from the prior presidential election, the Legislature passed Senate Bill 169, which downgraded student ID cards from a valid form of voter ID to a "secondary" ID that could only be used if accompanied by other proof of residence. SB 169, 2021 Leg., 67th Sess. (Mt. 2021). The law was eventually struck down as an unlawful infringement of the right to suffrage under Montana's Constitution. *MDP II*, ¶ 17.

The court described the law targeting students as not "reasonable" and stated that it served no "legitimate government purpose." *Id.*, ¶¶ 118–19.

87.    That same session, the Montana Legislature enacted Senate Bill 506, which prohibited 17-year-old residents who would turn 18 on or before election day from receiving mail-in ballots. HB 506, 2021 Leg., 67th Sess. (Mt. 2021). That restriction was struck down because the state failed to show that it served "any legitimate government purpose, much less that it is more important than the right to vote." *MDP II*, ¶ 119.

88.    The Montana Legislature also enacted SB 319, which added a last-minute amendment to an otherwise innocuous campaign finance reporting bill to ban broad swathes of political activity by student groups and on public college campuses. *See* Order on Motion for Summary Judgment, *Forward Montana v. Gianforte*, No. ADV-2021-611 (Mont. 1st Jud. Dist. Feb. 3, 2022). The court struck down the restriction as a violation of the state's single-subject requirement. *Id.* at 9–10.

89.    And in this most recent session, the Legislature enacted not only HB 413 but also SB 276, which limited the use of student IDs as valid forms of identification for purposes of registering to vote to those issued by the "Montana University System or any university that is a member of the national association of intercollegiate athletics." SB 276, 2025 Leg., 69th Sess. (Mt. 2025).

90.    HB 413 violates the Twenty-Sixth Amendment because it was motivated by a discriminatory purpose. It was adopted in response to an unprecedented wave of political activism by young Montanans, alongside other measures that reflect a clear backlash to that activism. It targets young Montanans— and in particular students—and makes it harder for them to vote. HB 413 is inexplicable on other grounds. Indeed, the Legislature failed to identify a single, documented instance in which allowing students and temporary workers who call Montana home to vote has led to fraud or any other illegal behavior or negative consequences. Simply put, HB 413 solves no identified problem in Montana's voting and election system and thus serves no purpose other than to prevent young people from voting.

### SEVENTH CLAIM
**Montana Constitution, Article II, § 14**
*The Student Residency Requirement violates Article II, § 14 of the Montana Constitution*

91.    Plaintiff hereby realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

92.    Article II, § 14 the Montana Constitution states in relevant part that "[a] person 18 years of age or older is an adult for all purposes." The only exceptions contained in the provision are allowances for statutory age limits on the purchase of alcohol, tobacco, and marijuana products.

- 33 -

93.    The provision was initially added to the constitution during the 1972 convention for the express purpose of protecting the right of suffrage for young people. As the provision's sponsor, Delegate Campbell, explained, the provision served to enshrine the right to vote recently granted 18-year-olds by the Twenty-Sixth Amendment to the U.S. Constitution and to "welcome in . . . the new citizens who have been accepted by our nation as responsible citizens and eligible to vote." *See* Montana Constitutional Convention Proceedings of 1971-1972, Vol. 5 1745 (1972).

94.    HB 413 has the effect of hindering student voters who are disproportionately young and belong to the precise classification of voters which Mont. Const. art. II, § 14 protects. For the reasons set forth *supra* ¶¶ 77-90, HB 413 also violates Mont. Const. art. II, § 14.

95.    The rights protected by Mont. Const. art. II, § 14 are fundamental rights, and therefore strict scrutiny applies.

96.    HB 413 does not address a compelling state interest, nor is it narrowly tailored to a compelling state interest. It is unconstitutional.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.    Declare that HB 413 violates the Right of Suffrage guaranteed under Article Two, Section 13 of the Montana Constitution;

B.  Declare that HB 413 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

C.  Declare that HB 413 violates the Equal Protection Clause of Article 2, Section 4 of the Montana Constitution;

D.  Declare that HB 413 is void for vagueness in violation of the Fourteenth Amendment to the U.S. Constitution;

E.  Declare that HB 413 is overbroad in violation of the First Amendment to the U.S. Constitution;

F.  Declare that HB 413 violates the Twenty-Sixth Amendment to the U.S. Constitution;

G.  Declare that HB 413 violates Article II, Section 14 of the Montana Constitution;

H.  Enjoin Defendants, as well as their agents and successors in office, from enforcing HB 413; and

I.  Grant Plaintiff such other and further relief that the Court deems appropriate, including but not limited to an award of Plaintiff's attorneys' fees and reasonable costs.

Dated: May 6, 2025                     Respectfully submitted,


By: */s/ Raph Graybill*

Raph Graybill
**Graybill Law Firm, PC**
300 4th Street North
PO Box 3586
Great Falls, MT 59403
(406) 452-8566
raph@graybilllawfirm.com

Abha Khanna*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(206) 656-0177
akhanna@elias.law

Marcos Mocine-McQueen*
Marisa A. O'Gara*
Katie Chamblee-Ryan*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
mmcqueen@elias.law
mogara@elias.law
kchambleeryan@elias.law

*Attorneys for Plaintiff*
*\*Motions for Pro Hac Vice Forthcoming*